**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| BRAD LIEBERMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 00 C 05662 |
| | ) | |
| TIMOTHY BUDZ, LINDA BAKER, VICTORIA | ) | Judge John J. Tharp, Jr. |
| DOLL, DR. EDWIN CAREY, THOMAS | ) | |
| MONAHAN, JUDY BUCHALSKI, LEE | ) | |
| STEINER, and TIMOTHY KNOEBEL, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Brad Lieberman, an adjudicated sexually violent person ("SVP") under Illinois law, *see* 725 ILCS 207/1 *et seq.*, is a civil detainee who claims that his constitutional rights were violated in various ways while he was institutionalized at the Treatment and Detention Facility ("TDF") at Sheridan, Illinois. His lawsuit alleges that he was subjected to sexual harassment, unfit conditions of confinement, and deliberate indifference to his serious medical needs during his eight months at the Sheridan TDF in 2000. As (at least) the eighth district judge to preside in this case since its filing in November 2000, the Court now takes up three motions for summary judgment filed by (1) the estate of Dr. Carey (now deceased), the plaintiff's treating doctor at Sheridan; (2) Timothy Budz and Thomas Monahan, the Facility Director and the head of the statewide SVP program, respectively; and (3) Victoria Doll, the Security Therapy Aide who allegedly harassed the plaintiff.[1] Plaintiff had the benefit of appointed counsel in responding to these motions, and the Court thanks counsel for their service.

---

[1] Defendants Baker, Buchalski, Steiner, and Knoebel did not move for summary judgment or join any of the other defendants' motions.

Because some issues overlap between the pending motions, the Court organizes its decision by claim, rather than serially addressing each motion. Only undisputed, material facts properly established under Local Rule 56.1 are recited, unless otherwise noted.

## I.      Deliberate Indifference to Serious Medical Needs

Lieberman claims that Dr. Edwin Carey[2] was deliberately indifferent to two serious medical conditions: Graves' disease and a skin lesion that was ultimately diagnosed as skin cancer. Dr. Carey's estate contends that Lieberman received treatment that was well within the range of acceptable medical judgment.

a.  Facts

There is no dispute that, at the time he entered the Sheridan TDF in January 2000, Lieberman suffered from Graves' disease, an autoimmune disorder that causes hyperthyroidism and a raft of associated symptoms. Lieberman took two prescription medications, Inderal and Tapazole, for his condition. Shortly after arriving at Sheridan, Lieberman saw Dr. Carey about the condition, and on January 7, 2000, Dr. Carey wrote him a prescription for a three-month supply of both medications. When the prescription ran out (prematurely, according to Lieberman, who asserts he was not dispensed the full three months' worth of medicine), Lieberman asked Dr. Carey to refill his thyroid medications. Dr. Carey said that Lieberman "did not need" the medicine and did not refill it. Lieberman became ill. He repeatedly requested the medication, directly to Dr. Carey and by filing grievances.

On several occasions in 2000, Lieberman complained to Dr. Carey about a skin lesion on his nose. Dr. Carey treated the lesion as cystic acne, or "a zit gone bad." He prescribed topical medication. Lieberman was not satisfied with the diagnosis. He believed, primarily based upon

_____

[2] The motion to dismiss of defendants Budz, Monahan, and Baker, was granted with respect to the medical-care claim. *See* Mem. Order & Op., Dkt. # 175 (January 28, 2010) (Coar, J.).

pictures given to him by family members, that his lesion was skin cancer. He showed his photographs to Dr. Carey, who continued to treat the lesion as acne throughout Lieberman's time at Sheridan. In September 2002, long after Lieberman had been transferred to another TDF in Illinois (in August 2000), the lesion was diagnosed by a plastic surgeon as basal cell carcinoma, a form of skin cancer. In the meantime, several other doctors had, like Dr. Carey, treated Lieberman for acne or related conditions rather than skin cancer.

    b.  Discussion

As a civil detainee, Lieberman's medical-care claim arises not under the Eighth Amendment's ban on cruel and unusual punishment, but under the due process clause of the Fourteenth Amendment. *Sain v. Wood*, 512 F.3d 886, 893 (7th Cir. 2008); *Brown v. Budz*, 398 F.3d 904, 910 (7th Cir. 2005). However, the distinction is immaterial for purposes of this claim: the well-known deliberate indifference standard applies. *Minix v. Canarecci*, 597 F.3d 824, 831 (7th Cir. 2010); *Williams v. Rodriguez*, 509 F.3d 392, 401 (7th Cir. 2007). Thus, to defeat summary judgment, Lieberman's first task is to present evidence that he had an "objectively serious" medical need of which Dr. Carey was aware. *See King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012). Dr. Carey's estate wisely does not dispute these elements.

Next, Lieberman must demonstrate a genuine issue of fact on the question of whether Dr. Carey was deliberately indifferent to his serious medical needs. *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012). Deliberate indifference is akin to criminal recklessness; it is more than negligence or even gross negligence. *Farmer v. Brennan*, 511 U.S. 825, 836-40 (1994); *King* 680 F.3d at 1018. When the defendant is a medical professional, liability ensues only if the treatment (or lack of) was such a departure from accepted professional judgment, practice, or standards as to demonstrate that he did not base the decision on such a judgment. *King*, 680 F.3d at 1019.

Malpractice—negligence—is not the benchmark; there must be "treatment that is so far out of bounds that it was blatantly inappropriate or not even based on medical judgment." *Id.*

Dr. Carey's estate maintains that he provided treatment that was within an acceptable range of professional judgment, and that Lieberman's disagreement with the course of treatment cannot produce a genuine issue of material of fact. The Court disagrees as to the thyroid condition and agrees as to the skin cancer.

First, there is a genuine issue of material fact as to whether Dr. Carey appropriately stopped treating Lieberman's Graves' Disease with medication. The estate pins the entire case on Lieberman's testimony that he was told he "did not need" the medication, insisting that this is proof that Dr. Carey acted reasonably in not prescribing it again. But that is true only if Dr. Carey actually exercised a medical judgment to determine whether the prescriptions were medically indicated *and* that judgment is within accepted professional standards. "A prison physician, as the inmate's acting primary care doctor, is free to make his own, independent medical determination as to the necessity of certain treatments or medications, *so long as* the determination is based on the physician's professional judgment and does not go against accepted professional standards." *Holloway v. Del. Cty. Sheriff*, 700 F.3d 1063, 1074 (7th Cir. 2012). But simply stating that treatment isn't necessary is not in itself indicative of a medical judgment: "Physicians cannot escape liability simply by 'refusing to verify underlying facts" regarding the potential need for treatment." *Ortiz v. Webster*, 655 F.3d 731, 735 (7th Cir. 2011).

The evidence of record allows the inference that Dr. Carey arbitrarily discontinued the medication rather than determining through the exercise of medical judgment that it was not necessary. Dr. Carey knew that Lieberman's endocrinologist had put him on thyroid medications, and Dr. Carey agreed that those prescriptions were indicated by Lieberman's

condition—he prescribed them, too. There is no evidence that Dr. Carey later conducted any examination or test that revealed a change in Lieberman's condition, or that his Graves' Disease was anything but chronic. Yet when it came time for a refill, none was forthcoming. Nothing in the record explains Dr. Carey's departure from his own treatment of the disease to that point. *See Ortiz*, 655 F.3d at 735 (fact issue created where doctor "ignored his own opinion" that further tests or surgery would be needed in near future). And there is no dispute that Lieberman "became ill" without his medication, but Dr. Carey did not change his mind about prescribing the medicine. *See Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005) ("obdurate refusal to alter . . . course of treatment" despite its failure creates a triable issue of fact). Absent evidence suggesting that Dr. Carey's decision to discontinue Lieberman's thyroid medication—his own prescribed treatment to that point—resulted from the exercise of medical judgment, the record allows for a reasonable inference that it was not. Therefore, summary judgment is not appropriate.

On the other hand, Lieberman has not marshaled any evidence of deliberate indifference to his skin lesion. Dr. Carey did not ignore Lieberman's complaints. He diagnosed Lieberman with inflamed or cystic acne and treated it with the corresponding topical drugs. We know now that his diagnosis was wrong. But there is a dearth of evidence to suggest that Dr. Carey's inaccurate diagnosis was anything but a mistake, which in itself cannot be the basis of liability for a constitutional violation. It has been settled since *Estelle v. Gamble*, 429 U.S. 97 (1976), and reaffirmed countless times since then, that negligence in diagnosing or a treating a condition is not grounds for a constitutional violation. *Id*. at 106; *see Farmer*, 511 U.S. at 842; *Jones v. Simek*, 193 F.3d 485, 490 (7th Cir. 1999); *Steele v. Choi*, 82 F.3d 175, 179 (7th Cir. 1996).

Because it is Lieberman's burden to prove that Dr. Carey recklessly, rather than negligently, misdiagnosed his skin lesion, it is incumbent on him to come forth with *evidence*

5

showing that Dr. Carey's diagnosis and treatment were so blatantly, clearly wrong as to be a total departure from professional medical judgment. Without evidence that Dr. Carey actually knew what was wrong, or that he knew of and disregarded a substantial risk that Lieberman had skin cancer, Lieberman can succeed only by showing that his condition was so "obvious" that any minimally competent doctor would have diagnosed it. *Steele*, 82 F.3d at 179. This could be accomplished with expert testimony, but Lieberman has none. He does not have an independent medical expert, and the doctor who ultimately diagnosed Lieberman, after a biopsy, did not opine on the reasonableness of the prior treatment Lieberman had received.

Indeed, any claim that Lieberman's condition should have been obvious is belied by the diagnoses of the several physicians he saw after departing the Sheridan TDF in August 2000 for another facility. Like Dr. Carey, doctors at the Joliet TDF failed to diagnose him with cancer, instead treating him for cystic acne or similar conditions. The Seventh Circuit has explained that when multiple doctors "draw the same (erroneous) conclusion; it is difficult at best to claim that another diagnosis was 'obvious.'" *Steele* 82 F.3d at 178-179. Lieberman protests that his (mis)treatment by other doctors is irrelevant[3] to his claim against Dr. Carey, but that is wrong. The evidence goes directly to the obviousness of Lieberman's condition, which is the core of the professional judgment standard. *See id.* (other doctors' views were "important").

Finally, the fact that *Lieberman* thought he had skin cancer does not speak to whether Dr. Carey exercised appropriate medical judgment. The detainee's disagreement with the treatment provided is not indicative of deliberate indifference. *Johnson v. Doughty*, 433 F.3d 1001, 1013 ("Mere dissatisfaction or disagreement with a doctor's course of treatment is generally

---

[3] Lieberman also objects that medical reports of other doctors lacked foundation and were hearsay. However, the estate submitted an affidavit sufficient to authenticate the records. And the records were offered to show the fact of other diagnoses, not for their truth—*i.e.*, to prove that Lieberman had acne—.and, therefore, they are not hearsay.

insufficient.") Indeed, even disagreement among medical professionals does not prove deliberate indifference. *See Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006) (noting that "a difference of opinion among physicians on how an inmate should be treated cannot support a finding of deliberate indifference."). Here, we have even less than that, since multiple doctors generally agreed about the cause of Lieberman's lesion.

The foregoing discussion is intended neither to excuse the failure of Dr. Carey and others to properly diagnose the skin lesion nor to palliate the consequences of that failure. But it is Lieberman's burden to show that Dr. Carey's misdiagnosis was something more than negligence, and the record simply contains no evidence of that. All we know is that Dr. Carey, along with a number of other doctors, was wrong about the nature of the lesion, and that fact alone is insufficient to overcome summary judgment under the professional-judgment standard. Accordingly, the Court will allow Lieberman's medical-care claim to proceed only as to the denial of medication for his Graves' disease.

## II.     Conditions of Confinement

Lieberman next alleges that the conditions of confinement in the SVP Unit at the Sheridan TDF were so poor as to violate his constitutional rights. He brings the claim against Timothy Budz, who during the relevant time period was the TDF's Facility Director, and Thomas Monahan, who was the statewide Bureau Chief of the SVP program during some of that time. They now move for summary judgment.

a.   Facts

The premises of the SVP Unit at the Sheridan TDF were maintained pursuant to an Interagency Agreement between the Illinois Department of Corrections (IDOC) and the Department of Human Services (DHS), the agency that manages the SVP program. According to

the Agreement, IDOC was responsible for "necessary maintenance of the physical plant" of the building that contained the SVP Unit at Sheridan, including providing heat, water, repairs and extermination services. For its part, DHS was "responsible for maintaining appropriate sanitation and cleanliness on the unit and ensuring compliance with fire safety standards." IDOC is not a defendant to this lawsuit.

Lieberman's chief complaints about the living conditions are pest infestation, a leaky toilet, poor ventilation, and extreme temperatures, as well as dirty drinking water on a few occasions. Specifically, the undisputed facts are that Lieberman observed roaches and other insects, such as spiders and silverfish, in his unit. When Lieberman turned on his light at night, roaches would scatter. One time, he awoke with a roach on his face. He also heard mice on many occasions, and saw them in his cell between two and four times. Once a mouse ate through a package of Ramen noodles that was stored in his room. Lieberman believed that his pest problems would improve if his cell were not located so close to the damp shower facilities. Lieberman observed glue traps in certain common areas. It is disputed whether Defendant Budz made dismissive or sarcastic comments when Lieberman complained about the insects and mice.

Lieberman also had troubles with the temperature and ventilation in his cell. Using a thermometer feature on a clock, he says he recorded temperatures as high as 90 degrees in the summer and as low as 50 degrees in the winter. Sometimes workers in the facility wore coats and long underwear to keep warm. IDOC (not a defendant) ran out of the coats it generally made available to prisoners and detainees.

Lieberman testified that the toilet in his cell leaked water from the handle when it was flushed, and that at times the entire sewage system would malfunction, causing his toilet and others to back up and smell bad. The defendants dispute these facts.

Lieberman testified that on several occasions, Sheridan's water supply was interrupted for hours and even days. It is undisputed that on at least one occasion, water to the facility was turned off for days after a water main break, at which time tankers were brought in to supply water. Lieberman testified that he was served unsanitary water that was dipped out of a noticeably dirty bucket with a milk carton. The defendants dispute this testimony. Lieberman admits that he never became ill or dehydrated for lack of clean drinking water, and that unless there was a lockdown, beverages were available three times per day at mealtimes.

   b.  Discussion

The defendants argue that they are entitled to qualified immunity on Lieberman's claim of inhumane living conditions, because he cannot show that they violated a clearly established constitutional right of which a reasonable person would have been aware. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009). As to the first prong—whether there was any violation of Lieberman's rights—they argue that to the extent any of the alleged conditions have been substantiated, they were well within constitutionally acceptable standards. They further argue that they were not deliberately indifferent to the conditions, to the extent that they were aware of them and that they were the SVP program's responsibility, instead of the IDOC's. Indeed, defendant Monahan argues that the claim against him must fail because he had no personal involvement in creating the conditions about which Lieberman complains.[4]

_____

[4] The Court concludes that Lieberman failed to establish sufficiently severe or extreme conditions of confinement that would allow a reasonable jury to conclude that his constitutional rights were violated. But the Court also agrees that the conditions of confinement claim fails as to Monahan for the independent reason that Lieberman adduced no evidence of Monahan's personal involvement in creating the conditions he complains about. *See Palmer v. Marion Cty*, 327 F.3d 588, 594 (7th Cir. 2003). Monahan was an administrator for the SVP program and did not work at the Sheridan TDF, let alone participate in creating the detainees' living conditions. And Monahan cannot be liable under a *respondeat superior* theory. *See Perkins v. Lawson,* 312 F.3d 872, 875 (7th Cir. 2002).

Again, as civil detainee, Lieberman's claim is in the nature of due process, not cruel and unusual punishment. Civil detainees such as Lieberman "are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Lane v. Williams*, 689 F.3d 879, 881 (7th Cir. 2012) (quoting *Youngberg v. Romeo*, 457 U.S. 307, 321–22 (1982)). At a minimum, the Fourteenth Amendment requires that civil detainees be housed under "humane" conditions and given "adequate food, clothing, shelter, and medical care." *Sain v. Wood*, 512 F.3d 886, 893 (7th Cir. 2008); *see Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 664 (7th Cir. 2012) (noting that Supreme Court "has not yet determined just how much additional protection the Fourteenth Amendment gives" but that "the protections of the Fourteenth Amendment's due process clause are at least as broad as those that the Eighth Amendment affords to convicted prisoners"). To succeed on a conditions-of-confinement claim, the plaintiff must establish that he was subjected to an objectively serious deprivation and that the defendants knew of a substantial risk to the detainee's health or safety but nevertheless failed to take reasonable measures to prevent that harm from occurring. *Sain*, 512 F.3d at 893-94; *Henderson v. Sheahan*, 196 F.3d 839, 845 (7th Cir. 1999).

Taking all the facts in the light most favorable to Lieberman, the non-movant, he cannot overcome the qualified immunity defense because he has not marshaled sufficient evidence with which to show that the conditions of confinement at Sheridan were a violation of his constitutional rights or that Budz and Monahan knew about but failed to abate these conditions. The conditions of which Lieberman complains do not rise to the level of those serious deprivations that have been found unconstitutional. The conditions must be "extreme." *Henderson*, 196 F.3d at 839 (quoting *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)); *Dixon v. Godinez*, 114 F.3d 650, 642 (7th Cir. 1997). Both the nature of the condition of the length of

time during which the inmate is subjected to it are taken into account as part of this inquiry. *See Dixon*, 114 F.3d at 643-44.

Lieberman's occasional encounters with roaches and mice fall short of proving an unconstitutional condition of confinement. He submits no evidence beyond these personal encounters, which were neither frequent nor severe enough to prove an "infestation"—the kind of pervasive, unsanitary problem that can give rise to liability. *See, e.g., Antonelli v. Sheahan*, 81 F.3d 1422, 1431 (7th Cir. 1996) (severe infestation of cockroaches and mice, accompanied by physical harm, can be unconstitutional). Lieberman describes conditions equally or perhaps less extreme than those in *Sain*, where the detainee complained of frequent cockroach sightings and two cockroach bites. *See* 512 F.3d at 894. There, as here, the admittedly "unpleasant" conditions did not cross the threshold of unconstitutionality. *See id*.

Nor is the leaky and occasionally backed-up toilet a sufficiently severe deprivation to allow a jury to conclude that it violates the Constitution. Although Lieberman suffered discomfort, primarily from the smell, when his toilet backed up, he does not show these incidents to be anything but temporary. A temporarily backed up (but apparently not overflowing) toilet is not akin to a cell that is flooded with human waste or otherwise befouled to the extent that has been found unsanitary and inhumane in other cases. *See, e.g., Isby v. Clark*, 100 F.3d 502, 505–6 (7th Cir. 1996); *Jackson v. Duckworth*, 955 F.2d 21, 22 (7th Cir. 1992) (prisoner held in cell that allegedly was filthy and smelled of human waste, lacked adequate heating, contained dirty bedding, and had "rusted out" toilets, no toilet paper, and black worms in the drinking water). This case is more like *Sain,* in which the detainee's complaint that "the outdated plumbing in the unit emitted a foul odor," did not give rise to a violation. *See* 512 F.3d 888, 894. And

Lieberman's other complaint about his room's plumbing—water dripping from a leaky toilet handle—is even less serious and therefore is also not an "extreme" condition.

Nor has Lieberman proved that hot and cold temperatures he complains of were so persistent and extreme that they violated his constitutional rights. Lieberman claims (and the Court assumes) that he measured temperatures as high as 90 degrees and as low as 50 degrees, but he does not say when or for how long, so he fails to establish that he suffered from extended exposure to extreme temperatures. Lieberman admits that in hot weather, windows were opened and large fans were brought in to alleviate heat, and he does not describe any prolonged extreme heat or lack of ventilation. Again, in *Sain*, the Seventh Circuit concluded that a cell with poor ventilation and no air conditioning, which became "very hot," was not an extreme deprivation. *See* 512 F.3d 888, 894.

Lieberman's stronger claim is about the cold, but that falls short, too. Cold temperatures alone, if sufficiently extreme and prolonged, may constitute inhumane treatment. *See Dixon*, 114 F.3d at 643. Relevant factors include "the severity of the cold; its duration; whether the prisoner has alternative means to protect himself from the cold; the adequacy of such alternatives," and whether there are other uncomfortable conditions. *Id*. at 644. Lieberman's testimony—apart from his complaint that IDOC (not a defendant) did not provide him with a coat—does not illuminate these factors. Indeed, it is clear from the record that the heat at Sheridan functioned well—so well that officials allowed windows to be opened in the wintertime to alleviate the stuffy heat. This sometimes created a cross-breeze that resulted in too-cold temperatures. But Lieberman had a hooded sweatshirt and denim jacket to wear and blanket to use; unlike in *Dixon*, therefore, he was not left without alternative means to stay warm during these temporary fluctuations.

Finally, the denial of clean drinking water—one of life's true necessities—would certainly be an "extreme" deprivation if proved. But here, Lieberman's best evidence (his own testimony) shows at most the occasional temporary interruption in water service to the Sheridan facility. Lieberman does not say he was ever left without anything to drink, much less that he went without it for any prolonged period of time. Beverages were available at meals and in the commissary. He admits he suffered no harm in the form of dehydration or illness. As for the emergency water service that dispensed water from a dirty bucket with a milk carton—something the defendants dispute but the Court assumes in Lieberman's favor—Lieberman does not say that he ever drank it, let alone that he was harmed by it. And his observations about the equipment used to dispense water do not establish that water itself was unsanitary. The other effects of water shortage, such as not being able to shower for a period of days, do not constitute an extreme deprivation. *See Jaros v. Ill. Dep't of Corrs.*, 684 F.3d 667, 671 (7th Cir. 2012).

Even taken cumulatively, the conditions of confinement supported by the record would not permit a reasonable fact-finder to conclude that Lieberman was subjected to inhumane conditions during the eight months he resided at the Sheridan TDF. Lieberman also has very little evidence that defendant Budz (Monahan was not personally involved) knew of and recklessly disregarded the conditions of which he complains, but the Court need not reach the "deliberate indifference" inquiry because the conditions, individually and cumulatively, were not extreme deprivations. Because Lieberman cannot establish a violation of his constitutional rights (much less that they were so clearly established that no reasonable official would not have known that those rights were being violated), the defendants are entitled to qualified immunity on the conditions-of-confinement claim.

### III.    Sexual Harassment

Finally, defendant Victoria Doll moves for summary judgment on the claim that she sexually harassed Lieberman in violation of his constitutional rights, arguing that she has qualified immunity and that her conduct was not severe enough to violate the Constitution. But first, by way of a Rule 12 motion, she urges dismissal of the claims against her for failure to timely serve her with process. That is where the Court begins.

A.  Service of Process

There is no question that Doll never was served with the original complaint, which was filed on September 13, 2000. The amended complaint was filed on August 20, 2007. More than a year later, the Court appointed counsel for Lieberman for the limited purpose of perfecting service. Minute Entry, Dkt. # 124 (Oct. 6, 2008) (Moran, J.). This did not help much. Doll was not served until November 29, 2010—over a decade after this action commenced. In her answer to the amended complaint,[5] Doll asserted improper service and statute of limitations as affirmative defenses. Answer & Affirmative Defenses, Dkt. # 243 (May 10, 2011).

Doll now moves pursuant to Rule 12(b) to dismiss the claims against her with prejudice for failure to properly effect service upon her. She argues that nothing can excuse a 10-year delay in service, and further that, if the untimely service is excused, she will be prejudiced by having to litigate a claim that otherwise would have been untimely and not subject to re-filing. In response, Lieberman argues that Doll waived this defense by appearing and answering the complaint, as well as engaging in discovery and generally litigating the case in the year between her first appearance and her motion to dismiss (which accompanies a summary judgment motion

---

[5] Doll initially failed to timely respond to the complaint, but upon the appearance of her counsel on March 22, 2011, she was given additional time to answer or otherwise plead. Minute Entry, Dkt # 237 (Mar. 23, 2011) (Der-Yeghiayan, J.).

directed at the merits of the claim). Lieberman further argues that on November 16, 2000, the Court properly extended the 120-day deadline for serving Doll. Finally, he contends that he has good cause for not timely serving Doll because he had been informed on two occasions that service had been effectuated and because he was an incarcerated *pro se* litigant who had no means of investigating Doll's whereabouts.

Federal Rule of Civil Procedure 4(m) requires plaintiffs to serve their complaints within 120 days of filing. If plaintiff shows "good cause," that time "shall be" extended; there is no discretion. Fed. R. Civ. P. 4(m); *United States v. McLaughlin*, 470 F.3d 698, 700 (7th Cir. 2006) ("[I]f good cause for the delay is shown, the court must extend the time for service."). On the other hand, "if good cause is not shown, the court has a choice between dismissing the suit and giving the plaintiff more time." *McLaughlin*, 470 F.3d at 700.

Failure to timely serve a defendant generally results in dismissal without prejudice, *see* Fed. R. Civ. P. 4(m), but dismissal with prejudice is appropriate "where the plaintiff did not meet Rule 4(m) and where the statute of limitations expired during the federal case." *Cardenas v. City of Chicago*, 646 F.3d 1001, 1008 (7th Cir. 2011); *Conover v. Lein*, 87 F.3d 905, 908 (7th Cir. 1996). Doll asserts that the statute of limitations has long since expired on the claim against her (although she unhelpfully fails to say when), and Lieberman does not dispute that assertion.[6] The

---

[6] The statute of limitations for a § 1983 lawsuit is borrowed from state law, which in Illinois is two years. *Draper v. Martin*, 664 F.3d 1110, 1113 (7th Cir. 2011). The time runs from when the detainee knows or should know that his rights have been violated, but it is tolled during the administrative grievance process. *Draper,* 664 F.3d at 1113; *Walker v. Sheahan*, 526 F.3d 973, 978 (7th Cir. 2008). Here, Lieberman first reported Doll's inappropriate behavior in early May 2000, and she resigned as of May 8, 2000, effectively ending the grievance process. The statute of limitations therefore expired in May 2002 or thereabouts. The original complaint was filed in November of 2000, but was never served on Doll. If the Court dismissed the claims against her nominally "without prejudice," re-filing would be barred; even with a substantial amount of tolling factored in, for justifiable service delays or otherwise, it is hard to imagine that the statute was tolled (legally or equitably) into 2013 for claims that arose in 2000.

running of the statute of limitations is an important factor for the Court to consider in reviewing a motion to dismiss predicated on a failure to effect timely service. *See Panaras v. Liquid Carbonic Indus.* 94 F.3d 338, 341 (7th Cir. 1996).

The Court begins with the argument that Doll waived her untimely service defense. Lieberman insists that Doll's participation in the case—appearing, requesting extensions of time, answering the amended complaint, sitting for her deposition, and otherwise engaging in discovery—manifested her intent to litigate on the merits and therefore waived her right to assert improper service. The argument is not made with reference to the rules of procedure, but that is where it should start. Improper service of process is a Rule 12(b) defense. *See* Fed. R. Civ. P. 12(b)(5). Rule 12(b) says that if the defense is to be raised by motion, that motion "must" be made before a responsive pleading is filed. Here, that did not occur. Doll answered the complaint without first moving to dismiss for insufficient service of process; she therefore cannot raise the defense in a Rule 12(b) motion, which is how she purports to present it now. However, whether she waived *the defense itself* is another question. That is not a question that Rule 12(b) answers. Instead, Rule 12(h) tells us that certain Rule 12(b) defenses, including 12(b)(5), are waived only if not presented jointly with other Rule 12 defenses in a pre-answer motion (not our scenario), *or* if they are not presented in a responsive pleading. *See* Rule 12(h)(1)(B). Here, Doll did raise the defense in her responsive pleading. Under Rule 12(h), then, she did not waive the defense itself, although it is clear that she is not entitled to assert the defense in a Rule 12(b) motion. But that is what she did. Her Rule 12 motion is untimely.

Of course, courts routinely forgive untimely Rule 12 motions or convert mislabeled motions into the proper form—here, a motion for summary judgment. The Court need not

grapple with the proper course, though. Even if Doll's defense is allowed, it would not prevail on its merits.

The Court reviews with some degree of incredulity the efforts (such as they were) to locate and serve Doll. The original complaint of September 13, 2000, was never served on Doll, but a docket entry appears to reflect (erroneously) that a waiver of service was returned. Dkt. # 20 (Jan. 4, 2001). Apparently no one missed her during the next seven years of litigation (during which time the case was stayed for over two years). The amended complaint was filed on August 20, 2007, and a summons as to Doll first issued on September 26, 2007. A docket entry on November 7, 2007, reflects that her summons was returned executed. Dkt. # 97. Apparently this was a mistake, too. Judge Moran ordered another summons issued on August 28, 2008. Dkt. # 120. Then, on October 6, 2008, Judge Moran appointed counsel for the express purpose of serving all defendants. Counsel failed to accomplish service on Doll (despite yet another docket notation that that her summons was returned executed, see Dkt. # 131), prompting Judge St. Eve to order the Illinois defendants to provide last known contact information for her, *see* Dkt. # 146 (Mar. 2, 2009). Doll's absence from the case was again noted a year later, when Judge Coar ordered appointed counsel to file a status report regarding his efforts to serve Doll. Dkt. # 186 (March 9, 2010). Counsel reported that he thought service had been waived, recounted some marginal efforts at locating her after receiving the order suggesting otherwise, and requested additional time. Dkt. # 192 (April 13, 2010). But there is no indication that counsel ever undertook any further measures. On October 7, 2010, Judge Der-Yeghiayan appointed counsel to represent Lieberman for all purposes. On November 16, 2010, Lieberman was given until December 16, 2010, to properly serve Doll and was warned that "failure to properly serve Defendant Victoria Doll will result in the dismissal of the action as to Defendant Victoria Doll

pursuant to FRCP 4." Dkt. # 216. Miraculously, within two weeks of this warning, Doll was located and properly served. Dkt. # 220 (indicating return date of November 29, 2010).

Rule 4(m) provides that when service does not occur within 120 days of a complaint's filing, the Court must either dismiss the case *or* direct that service be accomplished within a specific time period. Apparently none of the prior judges on this case saw fit to dismiss the claim against Doll outright—perhaps for the very reason that she did not have a representative in the case to advocate this outcome. But neither is there any direction that service had to be accomplished within a specified time. Thus, when Lieberman's specially appointed counsel fell down on the job, there was no deadline missed. And Lieberman, who managed scores of filings (including substantive responses to motions to dismiss) while *pro se*, evinced no urgency whatsoever when it came to bringing Doll before the court.

In hindsight, then, there are legitimate criticisms about the urgency with which service was approached by all involved during this case's first decade. However, no matter how facially surprising the lapse of time is, service of the Amended Complaint on Doll was not technically deficient because the court repeatedly allowed more time for service. The record does not reflect whether prior judges extended the time period for "good cause" or exercised their discretion to allow additional time. The failure to set a "specified time" for service suggests the former, but there is no record of it. No matter their reasons, though, multiple judges were aware that service had not been accomplished and, by ordering further measures and allowing more time to implement them, they implicitly extended the 120-day period. This Court is loath to enforce Rule 4(m) in a manner inconsistent with the orders of a series of judges who preceded it, and upon whom Lieberman was entitled to rely in believing that he had not run out of time. Ultimately, Judge Der-Yeghiayan's warning on November 16, 2010, set a "specified time" for service under

Rule 4(m). And service was accomplished in that time period. Therefore, this Court cannot agree that Lieberman failed to serve Doll properly in compliance with Rule 4(m). It was a long and winding road, but Lieberman reasonably believed that he had been given that much time.

There are other reasons Lieberman has shown good cause for not serving Doll within 120 days. He was proceeding *pro se*, and although he is still required to follow the rules, he was led astray at several junctures by sources he was entitled to trust. The public docket in this case reflected that Doll had executed the return of service within the 120 day period. The parties' filings do not explain how or why this error occurred, although no one disputes that Doll was not served at that time. Lieberman's status entitled him to service by the U.S. Marshals Service; he had no reason to question the accuracy of their returns of service. Moreover, the efforts of Lieberman's specially appointed counsel to effect service of the amended complaint do not appear to have been particularly zealous, and counsel never followed up with the court after initial attempts to locate Doll, despite asking for additional time. Lieberman's failure to tackle the service problem himself is more understandable since he could have justifiably believed that it had been, or would be, taken care of. The unusual procedural track of this case, coupled with the plaintiff's obvious disadvantages in effectuating proper service, render the delay in service excusable for good cause. Accordingly, Doll's motion to dismiss will be denied.

B.  Merits

Doll argues that summary judgment is required on the sexual harassment claim because, although she admits to all of Lieberman's allegations concerning her inappropriate behavior for purposes of the motion, she contends that, as a matter of law, her conduct does not rise to the level of constitutional violation.

1.  Facts

Doll was a Security Therapy Aid in the SVP Unit at Sheridan while Lieberman was housed there. Not long after his arrival, Doll told Lieberman that she had feelings for him. She said she had never felt about anyone the way she felt about him, and that she didn't want anyone to take Plaintiff away from her. On one occasion, after Lieberman sat with another female staff member, Doll asked, "Is that your bitch girlfriend?" Defendant Doll gave Plaintiff ultimatums and would say "Tell me you're my guy," or "Tell me you're my boyfriend ... and everything will be fine." She also made suggestive comments about wanting to straddle Lieberman and about how he "turned her on."

Doll also made physical advances. She would frequently "find a piece of lint" on Plaintiff and touch it, and on one occasion licked her finger and wiped something out of Plaintiff's eye with it. Doll sometimes grabbed Lieberman's arms and told him that she liked to watch him work out. Doll would give Plaintiff a "smack on the butt" or lean over and bump him in the hallway. She touched his chest and touched his face with the back of her hand a couple of times.

Doll also would approach Lieberman in the laundry room and ask others to leave so she could talk to him. Several times, Doll pulled the elastic waistband of Lieberman's sweatpants out. A couple of times, Doll reached down toward Lieberman's genitals, and he jumped away from her. The contact was "slight" and "fast," and Lieberman would pull away. On at least three occasions, Doll physically touched Lieberman in the "private area," although there were other times when she put her hand "over there" but "nothing that was actually serious." Another time, Doll pulled Lieberman's elastic waistband out and said "Oh, yum-yum." On one occasion Doll grazed Plaintiff's groin with the back of her hand when they were walking in the yard.

Occasionally Doll presented herself to Lieberman and would shake her body and gyrate in a sexual manner, sometimes touching her body. Five or six times, Doll acted as though she was going to push Plaintiff onto his bed in his room. She gave him a "little shove" and said words to the effect of "You want it," "Go in there," and "Come on." On one occasion Defendant Doll told Plaintiff she had left him a "present" in his room, and she had tied tampons up all over it. Defendant Doll gave Plaintiff a cassette tape, some little notes, and wrote him a couple letters. The cassette tape contained some contemporary Christian rock songs, as well as a song titled "Pillow Talk," and a recording of Doll singing and moaning Lieberman's name.

Lieberman says that he was embarrassed and humiliated by Doll's behavior. On occasion, however, he considered reciprocating her advances, but he feared the consequences of doing so.

All of this is undisputed. So too are Doll's threats that Lieberman should "tell [her] what she [wanted] to hear"—presumably, that he wanted a relationship with her—or else she would "bring [him] down." The threat wasn't idle; on May 6, 2000, Doll reported Lieberman to the Facility Director (Budz) for "inappropriate behavior," which triggered a week-long investigation during which Lieberman was confined to his room. Doll told Lieberman that she could "stop this whole thing" if he would say he wanted to be with her. However, Lieberman had already orally complained to Budz about Doll and her advances. And on May 7, 2000, he gave Budz a long letter describing Doll's behavior in detail. Budz confronted Doll the next day, and gave her the option of resigning or being put on administrative leave pending termination proceedings. She promptly resigned.

## 2. Discussion

Doll primarily argues that none of the non-physical contact she had with Lieberman counts as harassment, and that the physical contact was too "slight" and "fast" to violate

Lieberman's rights. In response, Lieberman argues that the non-physical harassment should not be disregarded wholesale and that the totality of the harassment is sufficiently severe to warrant a jury determination of liability. Lieberman's arguments prevail.

Section 1983 provides a remedy for deliberate harassment by prison guards. *See Walker v. Taylorville Corr. Ctr.*, 129 F.3d 410, 414 (7th Cir. 1997); *Johnson v. Phelan*, 69 F.3d 144, 147 (7th Cir.1995) (inmates have "a remedy for deliberate harassment, on account of sex, by guards of either sex"). There is no clear definition of actionable "harassment," but the bar is not low. Standing alone, verbal harassment of an inmate does not constitute a constitutional violation. *See DeWalt v. Carter*, 224 F.3d 607, 612 (7th Cir. 2000). However, the bar is not so high as to require a sexual assault. *See Walker*, 129 F.3d at 411 (prisoner stated constitutional claim based on three interactions, only one of which involved touching).

Doll's arguments that the non-physical harassment is irrelevant must be rejected. *DeWalt* precludes liability based on verbal harassment *alone*, but it does not require that such conduct be disregarded altogether. Nor does any case cited by Doll, or any that the Court can find.

In any event, this case is not about mere words. It is undisputed that there were several instances of physical contact, ranging from "coincidental" bumping and brushing to three instances of Doll reaching into Lieberman's pants and touching his "private area" before he backed away. Moreover, Doll's statements, notes, and gifts to Lieberman made it clear she was actively pursuing a romantic or sexual relationship with him. Such conduct by a person in a position of power or control—be it a guard, a boss, a teacher—over the target of the advances is a hallmark of harassing behavior. Here we even have an explicit *quid pro quo*: Doll threatening to report Lieberman, and in fact doing so, if he would not agree to a relationship of some sort.

Furthermore, Doll broadly misses the mark in arguing that the physical contact she had with Lieberman was too "brief, slight, and fast" to permit liability. This is not an excessive-force case where the contact must be more than *de minimis* in order to be actionable. *See Washington v. Hively,* 695 F.3d 641, 643 (7th Cir. 2012). "An unwanted touching of a person's private parts, intended to humiliate the victim or gratify the assailant's sexual desires, can violate a prisoner's constitutional rights whether or not the force exerted by the assailant is significant." *Id.* For purposes of this motion, at least, Doll does not dispute that she reached into Lieberman's waistband multiple times and at least two or three times touched his "private area." The Court will not hunt for a line that separates a "brief" unwanted genital grab from an impermissible one. The uninvited touching of someone's genitals—absent a penological, medical, or security justification, such as a valid strip search—is harassment. Using qualifying terms such as "slight" and "fast" does not change this (especially when Lieberman says it was brief because he immediately recoiled from the contact). A jury could reasonably find, especially in conjunction with Doll's other statements and actions, that Doll violated Lieberman's constitutional rights.

Doll also argues—perfunctorily—that she is entitled to qualified immunity because it cannot be shown that "even inclusive of all of Plaintiff's claims of harassing language and verbal harassment, [there] was a violation of a clearly established constitutional right." But the right of a prisoner or detainee to be free from sexual harassment was clearly established as of 2000. *See, e.g., Johnson*, 69 F.3d at 147. And more generally, the right of a detainee not to be groped for sexual reasons was clear. *Cf. Bell v. Wolfish*, 441 U.S. 520, 559-60 (1979) (body cavity searches invasive of personal privacy and must be conducted reasonably and for "significant and legitimate security interests"). The Seventh Circuit had made clear that such claims were cognizable without regard to the sexes of the victim and perpetrator. *See Walker*, 129 F.3d at 411

("Sexual harassment does not necessarily occur only when a man harasses a woman, as Eric Walker's allegations illustrate."). Doll's cursory argument that in 2000 there was no right to be free from sexual harassment, including uninvited touching of the genitals, is unsupported by any authority and must be rejected.

C.  Failure to Protect

Lieberman has also sued Defendant Budz for failing to protect him from Doll's harassment. Budz moves for summary judgment, arguing that he cannot be found deliberately indifferent to the harassment because he acted swiftly against Doll upon receiving Lieberman's May 7, 2000, letter detailing his complaints, and Doll never returned to the facility. Lieberman argues that summary judgment is improper because he testified to submitting a written grievance about the harassment in March 2000. The only such grievance in the record is dated "8/1/00," but he says this is a "rewrite" of a grievance from March.

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 199-200 (1989). For this reason, a government actor such as Budz can be liable for failing to protect an inmate or detainee. *Id*. at 200.  This duty most often arises in the context of inmate-on-inmate violence or excessive force by a guard. But the principles are the same: there is liability for failure to protect only when the official both knows about a specific, substantial risk to the inmate and fails to take reasonable measures to abate it. *See Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008). Here, Lieberman's claim founders on the first prong because there is virtually no evidence of Budz's actual knowledge before May 2000, at which time he promptly disciplined Doll and removed the threat altogether.

24

Lieberman's testimony that he submitted a written grievance about Doll in March 2000 is the only evidence from which it could be inferred that Budz was aware of Doll's conduct. Lieberman himself says that he did not otherwise tell Budz about the "sexual nature" of his troubles with Doll. So there is no evidence (even a denial of the grievance) that Budz ever *received* a grievance before May, and Budz denies that he did. And Lieberman does not argue or submit evidence that the risk was so obvious that Budz should have appreciated it even without receiving a specific complaint. Nor does Lieberman attempt to show that any failure to act was the result of something more than negligence or inadvertence, which are incompatible with deliberate indifference. *See Washington v. LaPorte Cty. Sheriff's Dep't*, 306 F.3d 515, 518 (7th Cir. 2002). On so thin a record, it would be unreasonable for a jury to conclude that Lieberman had proved by a preponderance of the evidence that Budz possessed the requisite actual knowledge and callous or reckless state of mind. Therefore, Budz is entitled to summary judgment on the failure to protect claim.

\* \* \*

For the reasons set forth in this opinion, Dr. Carey's summary-judgment motion is GRANTED in part and DENIED in part; Budz and Monahan's summary-judgment motion is GRANTED; and Doll's motion to dismiss and motion for summary judgment both are DENIED.

Entered: January 15, 2013

_____

John J. Tharp, Jr.
United States District Judge